AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Ron Gad,<br><br>Defendant | Case No.   2:24-mj-00944 -duty |

**LODGED**
CLERK, U.S. DISTRICT COURT
**2/20/2024**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jp _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
**2/20/2024**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ clee _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 2, 2021 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | distribution child pornography |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Sandra Cornils, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   February 20, 2024

City and state:   Los Angeles, California

*Judge's signature*

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: D. Diaz x. 0302

## AFFIDAVIT

I, Sandy Cornils, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Ron GAD ("GAD"), date of birth November 6, 1974, for violation of 18 U.S.C. §§ 2252A(a)(2) (distribution of child pornography).

2.   The facts set forth in this affidavit are based upon information provided by other U.S. law enforcement agents; written reports about this investigation that I have received from other law enforcement agents; information gathered from the service of administrative subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by law enforcement agents/analysts; and my personal observations, training, experience, and background as a Special Agent.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.   BACKGROUND OF SPECIAL AGENT SANDRA CORNILS

3.   I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), United States Immigration and Customs

1

Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and am presently assigned to the HSI Ventura office in California ("HSI Ventura").  I have been employed as a federal law enforcement officer since May of 2008.  I successfully completed the ICE Special Agent Training Program at the Federal Law Enforcement Training Center.  During this program, I learned a number of valuable investigative techniques and was evaluated on many different subjects of investigation, including computer crimes and child pornography.  Prior to my employment with HSI, I was a Deputy Coroner with the Riverside Sheriff's Department.

4.    Through my training, experience and interaction with other Special Agents and law enforcement entities, I have become familiar with the methods of operation used by people who are involved with offenses involving the sexual exploitation of children including  use of the Internet to further those offenses.  I have assisted, participated, and supported numerous investigations involving offenses related to the sexual exploitation of children, including conducting arrests, preparing and executing search warrants, and conducting surveillance.  I am familiar with the facts and circumstances of this investigation because of my participation and discussions with other law enforcement officers involved with this investigation.

### III.  SUMMARY OF PROBABLE CAUSE

5.    Between September and October 2022, the San Luis Obispo County Sheriff's Office ("SLOCSO") initiated an investigation into Ron GAD.  GAD was identified as the subject

2

engaged in sexually explicit chats and telephone calls with a
SLOCSO undercover officer ("UCO") posing as a thirteen-year-old
girl.  Over the course of several weeks, GAD and the UCO
discussed plans for GAD to travel to San Luis Obispo to meet the
UCO to engage in sexual acts.  On October 24, 2022, GAD drove
over 180 miles from Beverly Hills to San Luis Obispo to a public
park where he and the UCO arranged to meet.  SLOCSO deputies saw
GAD engaging in counter-surveillance tactics designed to evade
law enforcement detection.  Deputies conducted a traffic stop
and arrested GAD and seized several digital devices.  GAD
claimed that he believed he had been communicating with an adult
who was role-playing as a minor as part of a sexual fantasy.

6.   I initiated an investigation into GAD inquiring of the
National Center for Missing and Exploited Children ("NCMEC") for
previous cyber tips related to GAD's internet presence.  NCMEC
provided a cyber tip that showed that on December 2, 2021, GAD
had possessed and distributed a Child Sexual Abuse Material
("CSAM") image utilizing the platform Snapchat.

7.   A search of GAD's digital devices pursuant to a
federal search warrant has revealed evidence of GAD's receipt,
distribution, and possession of CSAM constituting child
pornography, as well as communications with suspected minors,
and internet searches related to sex with minors.

#### IV.   BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, AND THE INTERNET

8.   In this affidavit, the terms "minor," "sexually
explicit conduct," "visual depiction," "producing," and "child

pornography" are defined as set forth in Title 18, United States Code, Section 2256. The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

9. Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers and child pornography:

a. <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child pornography is possessed, distributed, and used. Child pornographers can now produce both still and moving images directly from a common digital camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, possess, and share large numbers of child exploitation images and videos with other Internet users worldwide.

b. <u>Storage</u>. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images or videos at very high resolution.

c. <u>Internet</u>. The term "Internet" is defined as the worldwide network of computers — a noncommercial, self-governing network devoted mostly to communication and research with

roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  To access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

        d.   <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

        e.   <u>IP Addresses</u>.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to

5

the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.   <u>IP Address – IPv6</u>.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.   The following definitions:

i.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally

short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

ii.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

iii. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iv.   "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v.    "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

vi.   "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

vii. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.

Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

viii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

ix.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which

perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

x.   "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

xi.  "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

xii. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

xiii.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

xiv. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

xv. "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

xvi. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xvii.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xviii.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xix. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

xx.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xxi. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xxii.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xxiii.    A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## V.    STATEMENT OF PROBABLE CAUSE

10.  On November 1, 2022, I was briefed by SLOCSO Detective Kara Dickel regarding this investigation.  I learned the following information through police records and documents, conversations with other investigators on this case as well as Detective Dickel, and by reviewing all investigative materials provided by SLOCSO, including the undercover communications discussed below.

### A.    Initiation of Investigation

11.  On September 20, 2022, Detective Dickel was working as a UCO and posing as a 13-year-old girl on Chat Avenue, an online communications platform.[1]  The UCO entered a Teen Chat Room using

---

[1] Based on my training and experience, Chat Avenue is a website that hosts various chat rooms that are free to join, including a "Teen Chat" forum.  The chat rooms are free to join anonymously, and there is no verification of identity or age.

the username "Emma14" and received a private message from a user with the screen name "D.D." – later identified as GAD, as set forth below.[2]  Among other things, D.D. asked the UCO if she was interested in older men, and said he was 30 years old.  D.D. asked the UCO how old she was, and the UCO said she was 13 years old.  After exchanging a few messages on Chat Avenue, D.D. asked the UCO to continue communicating via text message.  The UCO agreed and provided a phone number.  D.D. immediately began text messaging the UCO on the number she provided.  D.D.'s phone number was 562-740-5518 (the "5518 number").[3]

**B.  Photo Sent by D.D. Leads to Identification of Ron GAD**

12.  On September 20, 2022, via text message, D.D. asked the UCO to send photos of herself.  The UCO sent D.D. a photo of herself that was processed through a face altering application that made her appear to be a young teenage girl.  In return, D.D. sent a photograph of himself.  The image depicted an adult male with wireless earphones on sitting on a cream-colored couch.  In the background, a metal Charlie Chaplin sculpture on a three-wheel bicycle can be seen.

---

[2] The following are summary portions of the chat between Detective Dickel posing as a 13-year old girl, and "D.D." – later identified as GAD, and not intended to be a verbatim account of everything said in the conversation.

[3] A search of the 5518 number through a law enforcement available database showed the number provided by user D.D. was a voice over internet protocol ("VOIP") phone number operated by Bandwidth.com,  VOIP is technology utilizing an IP network, such as internet, to transmit phone calls.  One function of VOIP technology is there is no location tracking.  A user can choose a phone number with any area code.

13.  SLOCSO investigators used an open-source image search engine which matched the image of D.D. to publicly available images of Ron Gad ("GAD").  A search of law enforcement available data bases for information on GAD's name resulted in identifying GAD, date of birth 11/6/1974.  A Department of Motor Vehicles record inquiry located GAD with the same date of birth and the California driver's license A8161603.  The driver's license photo appeared to be the same individual as the person known to UCO as D.D.

14.  Additionally, investigators conducted an open-source public search query of GAD on the internet and located numerous websites featuring GAD as a therapist in Beverly Hills, California.  For example, GAD was pictured on several publicly available websites advertising his business, Beverly Hills Therapy Group.  On one of the websites (Zencare.co), photographs of the inside of the therapy practice were publicly available. In one of those photos of the therapy practice, a room is depicted with a door to a therapy room displaying the name "Dr. Ron N Gad."  To the right of the door, a cream-colored couch is seen and a metal Charlie Chaplin sculpture on a three-wheel bicycle is displayed behind the couch on a shelf.  This appears to be the same Charlie Chaplin sculpture that appears in the background of the photo that D.D. sent to the UCO.

15.  Based on the foregoing as well as the investigation to date, investigators made the preliminary determination that the "D.D." communicating with the UCO was GAD.

**C.   GAD Engages in Explicit Chats with UCO**

16.   Over the course of the next several weeks, GAD and the UCO exchanged explicit communications via text messages.   The UCO told GAD she lived in San Luis Obispo ("SLO").

17.   For example, on September 20, 2022, by text message, GAD told the UCO that he was only able to talk to her while he was at work.   GAD also told the UCO that she had to be his "little secret," that he was "craving" her, that he wanted to "lick [her] all over," asked "would you let me eat your pussy? I want to taste you," and told the UCO to call him "daddy."   The UCO said her name was "Emma."   GAD also asked the UCO what she had done sexually with other men in the past, and the UCO said she had previously met an older man.   The UCO asked GAD if he was ok with her being so young.   GAD replied "Yup."   The UCO asked GAD if he would visit her.   GAD replied "Yes, I definitely would."   GAD asked the UCO to send him more pictures and videos.

18.   On September 21, 2022, by text message, GAD continued asking the UCO what she had done with the older man she had previously met in person.   The UCO said she and the man had gone to a hotel room to "kiss and cuddle and stuff."   The UCO asked what GAD would do with her if they met.   GAD said he would only tell her over the phone.   GAD continued to ask the UCO for pictures and expressed confusion over why she would not send more.

19.   On September 22, 2022, by text message, GAD told the UCO he was at work and horny because he was thinking about the UCO: "I was gonna jerk off lol," "I'm horny.  Should I watch

porn?"  GAD asked the UCO to "help."  The UCO asked how she
could help.  After trying to get the UCO to send pictures of her
face, GAD asked the UCO to go to the bathroom and send a picture
of her belly.  "Then lift your shirt a bit. Show me your belly"
"Plz.  I'll do anything 4u."  GAD then sent a picture of himself
holding his penis through his pants and said "Make me harder."
GAD continued to ask for pictures and said he was nervous about
whether the UCO was real and said he had been scammed before.
GAD said "I really want you Emma" and sent pictures of his naked
penis.  GAD asked to speak on the phone, and the UCO said she
would be able to speak the next day.

20.  On September 29, 2022, another law enforcement officer
Deputy Dugan posed as "Emma" and spoke to GAD on the phone.  The
call was recorded.  GAD said his name was "Holden."  The two
discussed GAD traveling to San Luis Obispo to meet "Emma," and
asked if she would ditch school to meet with him.  GAD asked if
he could take "Emma" to a hotel, and said he was dying to kiss
her.  Once again, GAD asked for more pictures.

21.  Approximately one minute after the call ended, GAD
sent the UCO a picture of his erect naked penis with the text
message "Just from hearing your voice.  I am dying to come get
you."  Later, via text message, GAD told the UCO "Please snap a
pic for Daddy." "I'm looking up SLO hotels rn [right now]."  GAD
asked UCO whether they could meet at a park in San Luis Obispo.
GAD asked UCO "how old ru again? I honestly don't mind.  Just
say." "BTW, I'm so into you" "I'd love to spoil you when I come.
Anything you want."  The UCO said "I am 13.  My birthday is next

month."  GAD responded "Fuck. You're hot."  GAD asked the UCO for her bra size and discussed what he and UCO should wear when they meet.  GAD later said "I've cleared the date in October. But let's talk about it.  Plan it."  The UCO said "Yehhh. When."  GAD replied, "Monday the 24th."  GAD reminded the UCO to delete their messages from her phone.

22.  On September 30, 2022, by text message, GAD told the UCO he had cleared his calendar to meet her in San Luis Obispo on October 24.  GAD said he was nervous because of the consequences if they got caught, and said he was paranoid because he had heard of fake texts, calls, and police traps.

23.  On October 6, 2022, by text message, GAD discussed coming to see the UCO at the park.  GAD said, "Monday the 24th. I'm planning on it."  GAD discussed with the UCO what he would do to her at a hotel where no one could see them.  GAD discussed holding hands, kissing her neck, face, and lips, touching her breasts, kissing his way up her legs to her panties and under, and said "I want to taste you."  GAD asked the UCO, "Do you have hair on your pussy?"  UCO said "No."  GAD replied, "I wish I could see" and said "God. It makes me really hard to think about," "You show, and I'll show anything you want to see," "I'm going to cum when I think about you tonight."  GAD asked the UCO when she last masturbated.

24.  On October 17, 2022, by text message, GAD asked the UCO for pictures, and the UCO sent a photo of herself altered to look like a 13-year-old girl.  GAD sent a clothed photo of himself.  GAD asked the UCO what she was doing.  The UCO said

18

she was doing homework and sent a picture of a child's math homework on a sheet of paper.  GAD asked the UCO "What grade ru in?"  UCO replied "7th."  GAD said, "You're my little lover," "You make me hard," and "Love you baby."  Later, GAD sent a picture of his erect penis and said, "Make me harder.  Send. Please.  I'm so hot 4u.  I want to cum 4u."

25.  On October 19, 2022, by text message, GAD continued to ask the UCO for pictures and expressed that he needed to see more pictures in order to be comfortable with meeting the UCO in person.  GAD asked if the UCO would video chat with him.  The UCO said she was not comfortable to do that.  GAD said the UCO did not really love him if she did not want to do things that made him happy or more comfortable.

26.  On October 20, 2022, by text message, GAD said he did not like it when he and the UCO fought.  The UCO sent GAD altered pictures of herself.  Later, GAD questioned the UCO about her past sexual history, and discussed the sexual acts he wanted to perform on the UCO.  GAD also mentioned being concerned about anyone seeing the UCO get inside his vehicle.

27.  Later that day, Deputy Dugan posed as "Emma" and spoke to GAD on the phone.  The call was recorded.  The two discussed sexual activities and GAD's upcoming visit to meet the UCO. Deputy Dugan, as "Emma," asked GAD if he would bring condoms, GAD said he would.  GAD confirmed he would be at Laguna Park when the UCO got out of school and that he has a big car, a sports utility vehicle with tinted windows.  GAD asked "Emma" if she was deleting their messages every night.  Deputy Dugan, as

19

"Emma," said she was.  Deputy Dugan ended the call by saying her mother was home and she had to get off the phone.  GAD said he couldn't wait until Monday, and he loved her.

**D.   GAD Makes False Exculpatory Statements to the UCO**

28.  On October 24, 2022, the day of the planned meeting, at 11:08 am, GAD sent a text message to the UCO that said "Listen, I just want to clarify.  This has been a fun Role Play.  I mean I love age-play.  But I just want to confirm that you're really a 19yo junior at the university like you told me when we first met in the chatroom.  Because, while I love this RP [role play], I can't come see someone who's really under age."  The UCO responded "umm I am not 19 and I do not go to a university.  I really thought u were coming to see me."  GAD said "No.  Seriously.  I can't come see you unless we're on the same page.  You have to be over 18 if I'm gonna come.  I'm sure you understand."  GAD continued telling the UCO "I'm on my way, but I just need to make sure," "I can't come unless I know you're legal and that you're real.  I'm on my way.  But…"

29.  Over the next two hours, GAD continued to ask the UCO to state that she was an adult, claiming he could not meet with her if she was underaged.  The UCO eventually stated, "yes i am 18 daddy."  GAD asked the UCO to state her date of birth.  The UCO said "ok…its October 15 2004," "r u good now? im in class.  see u afterschool."  GAD "Ok good.  Because I wouldn't come if you were underage."  Later, the UCO texted "Are u here???"  At 2:45 p.m. GAD responded "Close."

30.  At no point during the Chat Avenue conversation, the text messages, or the phone calls between GAD and the UCO did the UCO claim to be 19 years old.  Nor did GAD ever state that he believed the UCO was an adult or that they were role playing. On the contrary, GAD's statements and actions throughout the relationship with the UCO demonstrate that he believed the UCO was a 13-year-old girl.

31.  Based on their training and experience and the evidence that preceded these statements, SLOCSO law enforcement believed that GAD's statements about role playing were false exculpatory statements designed to protect GAD in the event he was stopped by law enforcement.  GAD's subsequent conduct and statements, described below, confirmed law enforcement's beliefs about his false exculpatory statements.

### E.  SLOCSO Arrest of GAD in San Luis Obispo

32.  On October 24, 2022, at approximately 3:00 pm, SLOCSO saw GAD driving a 2019 dark colored Audi SUV bearing California license plate 06TEN11 in San Luis Obispo.  GAD's vehicle spent 15 minutes circling Laguna Park, the designated meeting point with the UCO.  At various times, GAD's vehicle pulled over to the curb, pausing for a few moments, and then would resume driving around the park.  GAD appeared to be attempting counter-surveillance measures to detect law enforcement presence. Multiple undercover detective units conducted surveillance and saw GAD's driving behaviors.  Eventually, SLOSO deputies in a marked car conducted a traffic stop of GAD's vehicle and arrested GAD.  GAD was the driver and sole occupant of the

vehicle.  Investigators conducted a search of the vehicle and seized, among other things, digital devices believed to belong to GAD (for which we later obtained a federal search warrant, as discussed herein).

**F.   SLOCSO Interview of GAD**

33.  SLOCSO Detective Dickel advised GAD of his <u>Miranda</u> rights and conducted a recorded interview.  I have reviewed the SLOCSO reports and the audio-recorded interview with Detective Dickel.  During the interview, GAD made the following statements, among others:

a.   GAD admitted to enjoying the "fantasy" of chatting with a minor about sexual acts.

b.   GAD admitted to the sexual conversations with "Emma," but stated that "Emma" had told him in the chat room that she was a 19-year-old college student and had agreed to role play as a 13-year-old.  GAD said he expected to be meeting with an adult.

c.   GAD said he was not going to do anything illegal, and he did not bring the condoms or the panties that he told the UCO he would bring, and he did not make a hotel reservation.

d.   GAD told investigators to check the "recording" and/or the "record" showing that he was planning to meet with an 18-year-old.

34.  After the interview, GAD was arrested and booked into the jail at SLOCSO.

35.  On March 20, 2023, the San Luis Obispo County District Attorney's Office charged GAD with a violation of California

Penal Code Section 311.11(A) Possession of Matter Depicting
Sexual Conduct of Child.

G.   **HSI Review of SLOCSO Case File**

36.   On or about November 1, 2022, I was informed about the
SLOCSO investigation of GAD.  I conducted an open search of GAD
and located numerous websites featuring GAD and his therapy
practice.  I was able to locate the website for GAD's practice,
Beverly Hills Therapy Group.  The website lists the business
address as 9014 Burton Way in Beverly Hills, California.  I
preserved all internet content I could locate from my open-
source search.

37.   In December 2022, I reviewed the SLOCSO case file
related to GAD and learned about GAD's statements about his
beliefs about the UCO's age on the day of the meeting.  In my
training and experience, I know adult persons with a sexual
interest in children and willing to commit a sexual contact
offense on a child will attempt to evade law enforcement by
creating false exculpatory evidence to provide them with a
defense if they are caught by law enforcement.

38.   Based on my review of GAD's messages with the UCO, his
stated fears of being caught and of "Emma" not being real,
reports about GAD's suspicious driving behavior on the day of
his arrest, GAD's inconsistent statements in his post-arrest
interview (he said he did not bring condoms or panties or make a
hotel reservation and therefore did not do anything illegal, but
then said he believed he was meeting an adult), his ready
defense to SLOCSO to "check the record," and his admitted sexual

23

interest in minors, I believe that GAD intended to meet and actually believed he had been messaging and would be meeting a minor named "Emma" at Laguna Park in San Luis Obispo.

### H.   GAD Distributed CSAM via Snapchat

39.   Based on GAD's post-arrest claim that he was engaged in role-play and his stated sexual interest in children, I initiated an investigation to determine whether GAD was connected to any other reports of child exploitation offenses.

40.   In SLOCSO's debrief of GAD's case, Detective Dickel informed me that, based on her review of GAD's devices pursuant to the state search warrant, GAD used variations of usernames related to "Holden Caufield" and "holdenon4lyfe@gmail.com"[4] on social media platforms.

41.   The address listed on the business website for Beverly Hills Therapy Group is 9014 Burton Way in Beverly Hills, California.   In my open-source research several photographs were publicly available showing the interior and exterior of the therapy business.   Two photos of the exterior of the business (zencare.com) showed an exterior gate leading to the business doors.   On the columns of each side of the gate leading into the courtyard are the address numbers depicting "9012" and "9014."

42.   Using law enforcement databases I learned that GAD resided at 1489 S. Beverly Drive, Los Angeles.   I also learned

---

[4] "Holden" is the name that GAD gave to the undercover SLOCSO detective posing as "Emma" during a recorded phone call. "Holden Caulfield" (with an "l" in "Caulfield") is the name of the main character in the novel The Catcher in the Rye and in other stories by J.D. Salinger, who has been described in various articles as being a pedophile.

that GAD is associated with the telephone number 702-493-7788 ("GAD's Phone Number").  GAD used the phone number for his UPS mailbox paperwork in 2015.  GAD used the same phone number to apply for a United States passport in 2019.  This phone number is also the number GAD used to register for Charter Communication for his residence.  Additionally, I spoke with SLOCSO Detective Dickel who stated this is the same phone number GAD provided SLOCSO when GAD completed paperwork to have his vehicle released to his custody on December 19, 2022.

      1.   <u>GAD's Social Media Account was Flagged for CSAM</u>

43.  On December 8, 2022, I submitted an inquiry to the National Center for Missing and Exploited Children ("NCMEC") for cyber tips ("CT") related to variations of the usernames "Holden Caufield" and "holdenon4lyfe@gmail.com."

44.  On or about December 9, 2022, I received from NCMEC a list of cyber tips associated with variations of "Holden Caufield" and "holdenon4lyfe" in usernames for various social media platforms.  On the list, NCMEC CT 109637798 resolved to a location in Beverly Hills, California.[5]  I requested and reviewed CT 109637798, which contained the following information:

---

[5] Other NCMEC tips linked to variations of the name "Holden Caufield" (even misspelled) resolved to other locations, which furthers my belief that <u>The Catcher in the Rye</u> reference is a common one among individuals with a sexual interest in children.

       a.   On December 3, 2021, at 2:40:37 UTC, electronic service provider Snapchat[6] reported that the Snapchat user "holdenon4lyfe" posted a CSAM image file.

       b.   Snapchat identified the following user information:

          i.   Phone: +13109239931

          ii.  Date of Birth:  01-01-2000[7]

          iii. IP Address:  172.90.242.100 (the "Suspect IP Address")

          iv.  Date of event: 12-02-2021 at 16:25:23 UTC.

       2.   <u>The Cyber Tip File Contains CSAM</u>

45.   In January 2023, I obtained the CSAM file reported by Snapchat related to CT 109637798 and viewed the content.  The file is a video approximately 27 seconds in length.  The video depicts a real minor female approximately eight-to-twelve years old wearing a dark pink t-shirt and no clothing from her waist down.  The female child is seated on the floor, facing the camera with her legs splayed open and the top portion of her vagina is visible.  The video begins with the child taking two fingers and inserting the fingers into her vagina.  Halfway through the video, the child lifts her buttocks off the floor to show her entire vagina and buttocks as she continues to digitally penetrate herself with her fingers.

---

   [6] Snapchat is a multimedia instant messaging application and service that allows users to exchange images/videos and messages that can be set to appear to the recipient for a limited time set by the sender before it disappears.

   [7] I believe this to be a false birth date.

### 3.   The Suspect IP Address Belongs to GAD

46.  Charter Communications dba/Spectrum provided the following subscriber information for the Suspect IP Address for the dates December 2, 2021, at 4:24:00 pm, GMT and on December 3, 2021, at 2:40:00 am, GMT:

    a.   Subscriber Name:  Beverly Hills Therapy Group

    b.   Service Address:  9012 ½ Burton Way, Beverly Hills, CA 90211-1618

    c.   Username or Features:  RON@BHTEMAIL.COM (I believe "Ron" refers to GAD and "BHT" references Beverly Hills Therapy)

    d.   Phone Number:  702-493-7788 (GAD's Phone Number).

**I.   GAD Possessed and Received CSAM on His Digital Devices**

47.  On May 8, 2023, the Honorable Charles Eick, United States Magistrate Judge, issued a warrant authorizing the search of four of GAD's digital devices seized upon his arrest by SLOCSO in October 2022.  The forensic review of GAD's devices is ongoing.

48.  To date, a search of those devices has revealed numerous files of CSAM, including files depicting real children known to law enforcement.

49.  The review of GAD's digital devices also revealed evidence of receipt of CSAM.

**J.   GAD's Continued Sexual Interest in Minors**

50.  The review of GAD's digital devices also revealed the following:

        a.   The following searches conducted in October 2022, among others:

             i.   "Underage sex in slo";

             ii.  "Catchung underage predatorsin san luis obispo";

             iii. "Underage sex opporation in san luis obispo";

             iv.  "Underage sex sting in san luis obispo";

             v.   "Child sex sting in san luis obispo";

             vi.  "Catch predator in san luis obispo";

        b.   Visits to the following websites, among others:

             i.   Teen-chat.org

             ii.  Kidschat.net

        c.   Bookmarks for the following websites, among others:

             i.   Teenfuckrx.com;

             ii.  Teenmoviesarchive.com;

             iii. Omegleteenporn.com;

             iv.  Teeniestube.net/teenporn;

        d.   Emails containing links to Mega.nz, a file hosting service commonly used to exchange CSAM.

## VI.  <u>REQUEST FOR ATTESTATION BY TELEPHONIC OR RELIABLE ELECTRONIC MEANS</u>

51.  I am stationed in the HSI Field Office in Camarillo, California, in the County of Ventura, within the Central District of California, which is approximately 53 miles from Downtown Los Angeles.

52.   In addition, I am currently traveling outside of the Central District of California.   I therefore respectfully request approval for attestation by telephonic means.

### VII.  CONCLUSION

53.   For the reasons described above, I respectfully submit there is probable cause for the requested complaint against Ron GAD for violation of 18 U.S.C. § 2252A(a)(2) (distribution of child pornography).


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 20th day of February, 2024.

_____
HONORABLE JUDGE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

29